Felecia IRVIN, as the Mother and Next Friend of Geoffrey Mitchell, a Minor, and Lucie Wade, as the Grandmother and Next Friend of Calvin Wade, a Minor, Plaintiffs,

v.

Edmond KACZMARYN, John Van Dien, Michael Murphy, and the City of North Chicago, Defendants.

No. 94–C–5410.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 23, 1996.

Daniel Playfair Field, Waukegan, IL, for plaintiffs.

Steven M. Puiszis, David M. Jenkins, Hinshaw & Culbertson, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This civil rights action is brought pursuant to 42 U.S.C. § 1981 (Count I), 42 U.S.C. § 1983 (Counts II and III), and the Illinois common law of false imprisonment (Count IV). Plaintiffs' minors (hereafter "plaintiffs") Geoffrey Mitchell and Calvin Wade allege that the individual defendants, Edmond Kaczmaryn, John Van Dien, and Michael Murphy, improperly detained them, and that Kaczmaryn used excessive force in searching them, which Van Dien failed to prevent. The plaintiffs also claim that this treatment was racially discriminatory. The only claim against the City of North Chicago is the state law claim; the City is not a defendant in the federal civil rights claims.

All defendants [1] have moved for summary judgment. Their argument focuses on the Fourth Amendment violations alleged in Count II,[2] contending that either there was no seizure, or the necessary level of suspicion (either reasonable suspicion or probable cause) existed and justified any seizure of the plaintiffs that occurred. Any such seizure, they contend, was also reasonable in scope, duration and force as a matter of law. The defendants also argue that, as their actions were justified by probable cause, they should also receive judgment in their favor on the state law false imprisonment claim in Count IV. Finally, they argue that they are entitled to qualified immunity (under federal law for the individual defendants and under state law for the City). All parties have submitted memoranda of law and statements of facts supported by affidavits.[3]

As a preliminary matter, we note that the defendants have filed a motion to strike one of the affidavits submitted by the plaintiffs, an affidavit by Elisha Mitchell. The problem is that Elisha Mitchell is inextricably linked to both parties: he is both the Assistant Chief of Police for the City of North Chicago, and the stepfather of Geoffrey Mitchell, one of the plaintiffs' minors. Defendants' main argument is that the affidavit should be stricken on the grounds that contact between the plaintiffs' attorney and a City employee is unethical under Rule 4.3 of the Rules of Professional Conduct for the United States District Court for the Northern District of Illinois. The defendants also note the irrelevance of most of the affidavit to the issues presented by their motion for summary judgment.

■ We agree that the contents of the affidavit are irrelevant to the present motion, and thus have not considered the affidavit in deciding the motion. We also agree that, although the plaintiffs' attorney maintains that he was sought out by Mr. Mitchell to

---

1. At the time the motion for summary judgment was initially filed, Michael Murphy was not a defendant. The plaintiffs were permitted to file a Second Amended Complaint during the pendency of this motion, the parties agreeing that the addition of Murphy did not change the nature of the claims asserted and that the motion would be entertained on behalf of Murphy as well as the other defendants.

2. The defendants never state why summary judgment is proper on the plaintiffs' § 1981 claim (Count I) and § 1983 equal protection claim (Count III). For this reason as well as others discussed below, we decline to grant summary judgment on these counts.

3. Local Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." Similarly, Local Rule 12(N)(3)(a) requires the nonmoving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. The nonmoving party may also submit a statement of "additional facts that require the denial of summary judgement" with respect to which the movant, in turn, may respond. All material facts set forth in either party's statement are deemed admitted unless controverted by the statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b); see also Flaherty v. Gas Research Inst., 31 F.3d 451, 453 (7th Cir.1994); Waldridge v. American Hoechst Corp., 24 F.3d 918, 921–22 (7th Cir.1994).

make the affidavit rather than the other way around, the plaintiffs' attorney was engaging in potentially sanctionable conduct in exploiting his contact with Mr. Mitchell. *See, e.g., In re Air Crash Disaster Near Roselawn, Indiana on October 31, 1994,* 909 F.Supp. 1116 (N.D.Ill.1995) (admonishing an attorney for similar conduct). The defendants have not sought sanctions here, however, and our decision not to consider the affidavit in deciding the motion for summary judgment renders the motion to strike moot. Accordingly, we deny the motion to strike as moot.

## STATEMENT OF FACTS

The following factual account is taken from the parties' Rule 12(M) and 12(N) statements, and consists primarily of uncontested facts. Contested material facts are identified as such. This order will serve as an order pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, finding that the uncontested facts "exist without substantial controversy," and are therefore not subject to dispute. FED.R.CIV.P. 56(d).

Plaintiffs Calvin Wade and Geoffrey Mitchell are thirteen and fourteen years old, respectively. Jamal Mitchell is Geoffrey's brother. All three boys are African American. The individual defendants, Edmond Kaczmaryn, John Van Dien, and Michael Murphy, are current or former police officers for the City of North Chicago, Illinois. All three officers are caucasian.

At approximately 3:00 p.m. on September 28, 1993, Calvin, Geoffrey and Jamal were walking home from school through a parking lot used by the North Chicago police department, near the North Chicago municipal building. Plaintiffs Geoffrey and Calvin were walking ahead of Jamal. Jamal noticed a car with its door ajar and, without saying anything to Geoffrey and Calvin, walked over to the car and entered the car. Jamal took a pack of chewing gum from the seat of the car and exited the car. Ralph Peterson, an automobile maintenance man for the City, saw Jamal enter the car and called out for Jamal to stop. Peterson was then approached by police officer Michael Murphy, who was in the parking lot.

The exact phrasing of Peterson's words to Murphy are in dispute. Peterson testified in deposition that he told Murphy only that one boy, Jamal, had gone into the car. Murphy has filed affidavits recalling that Peterson told him that "these kids were inside Lieutenant Kaczmaryn's car," or words to that effect.[4]

Murphy told the boys to accompany him into the police station, saying, "come on, let's go." The three boys complied with Murphy's summons. Peterson had not noticed Geoffrey and Calvin until then. As they were headed into the station, Geoffrey asked why Calvin and he had to go into the police station, as they had not done anything. Peterson replied (in Murphy's presence), "I didn't say you guys went in the car. I said this young man [indicating Jamal] went in the car."

Murphy entered the police station with the three boys and turned them over to Kaczmaryn, telling him that "these kids were inside your car," or words to that effect. Murphy then left. The boys were seated in an area near the front of the station. Peterson entered the station about two minutes later and identified Jamal to Kaczmaryn, telling Kaczmaryn that Jamal was inside Kaczmaryn's car and had taken a pack of gum. Peterson cannot recall whether he then handed the pack of gum to Kaczmaryn. Peterson did not state that Geoffrey or Calvin had done anything wrong.[5] Peterson then left.

At some point during this time, defendant Van Dien entered the area where the boys were seated, and Kaczmaryn instructed him to begin photographing and fingerprinting the boys. Meanwhile, Kaczmaryn conducted a pat-down search of each boy individually, having each one stand and face the wall with hands on the wall, and then kicking his feet

---

4. Because it concerns disputed facts, this paragraph is not part of the Court's Rule 56(d) order.

5. Peterson testified that he said to the boys either "Well, that was the lieutenant's car that you all went in" or "Well, that was the lieutenant's car that the young man was in." Peterson dep. at 11, 19–20. Kaczmaryn was present for this statement.

apart until he was in a spread stance. After this process had been completed, and the boys were turned over to the juvenile officer, Olander Warner. Warner asked the boys to follow him back into the detective bureau, where he interviewed them for approximately one hour and then released them. The last boy to be released reached home no later than approximately 5:00 p.m.[6]

There are, of course, additional contested facts. The plaintiffs contend that Van Dien had entered the area where Kaczmaryn was standing and the boys were sitting in time to witness Peterson's identification of Jamal as the sole boy who had entered Kaczmaryn's car. The parties also dispute whether Peterson told the police inside the station that the other boys were "with" Jamal.

The plaintiffs aver, via their affidavits, that Kaczmaryn stated that he was "so mad that he wanted to kill them," at the time that he asked Van Dien to photograph and fingerprint the boys and write up a report. Geoffrey and Calvin also state that as Kaczmaryn searched them he used excessive force, kicking their feet apart with such force that Calvin asked him to stop and complained that he was going to fall, and Geoffrey sustained bruises severe enough to keep him out of football practice. Geoffrey also avers that Kaczmaryn deliberately squeezed his eyeglasses in the breast pocket of his coat during the patdown and crushed them, despite Geoffrey's request that Kaczmaryn be careful of the glasses. Throughout the search, plaintiffs aver that Kaczmaryn was shouting and abusive, calling them niggers and black fuckers, and saying that they had better get used to this because they would be doing it for the rest of their lives. Plaintiffs state that Van Dien was in the same area, watching and hearing everything, but refused to intervene. Defendants deny all these statements. Finally, the parties dispute whether either Van Dien or Warner ever contacted the boys' parents or other relatives to inform them that the boys were at the station.

## LEGAL STANDARDS

■ Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). The nonmovant must "make a showing sufficient to establish the existence of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial" in order to withstand a motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[I]n determining whether factual issues exist, a reviewing court must view all the evidence in the light most favorable to the non-moving party." *Collins v. American Optometric Ass'n*, 693 F.2d 636, 639 (7th Cir. 1982). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## THE FOURTH AMENDMENT CLAIMS

The defendants' main arguments in favor of summary judgment focus on the plaintiffs' various Fourth Amendment claims: unreasonable seizure by Murphy, and the unreasonable continuation of that detention by Kaczmaryn and Van Dien; the use of excessive force by Kaczmaryn in searching the boys; and Van Dien's failure to intervene to prevent the excessive force. The defendants contend that either there was no seizure within the meaning of the Fourth Amendment or that if there was, it was supported by either reasonable suspicion or probable cause and was reasonable in scope, duration and force.

### The Initial and Continued Detention

■ As an initial matter, it is clear that Murphy's detention of the boys by summoning them to follow him into the police station was a "seizure" within the meaning of the Fourth Amendment. The defendants contend that this was not a seizure because the

---

6. The Court's Rule 56(d) Order ends here.

boys accompanied Murphy voluntarily. A person has been "seized" within the meaning of the Fourth Amendment if "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). "[T]he appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 436, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991). In this inquiry, the detainee's age, education, and intelligence are factors to be taken into account when determining the voluntariness of submission to a police request, although they are not decisive. *Mendenhall,* 446 U.S. at 558, 100 S.Ct. at 1879 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)).

The issue is whether a reasonable person would have felt free to disregard Murphy and walk away. Geoffrey Mitchell stated in his affidavit that he did not feel free to decline Murphy's request to accompany him, which he interpreted as an order. Geoffrey Mitchell Aff. ¶ 12. The defendants have presented no evidence that the plaintiffs were in fact free to ignore Murphy and go about their business, or that a reasonable person would have believed so. *See Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988). It is a reasonable inference that the plaintiffs would have been prevented from leaving if they had sought to do so. Nor have defendants cited any case law to support their argument that the proximity of the police station (50 feet away) meant that there was no seizure when the plaintiffs were asked to accompany Murphy inside. In these circumstances, we have no difficulty in finding that the plaintiffs were seized within the meaning of the Fourth Amendment. *See Florida v. Royer,* 460 U.S. 491, 502–03, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983).

■ The next question is the type of seizure that occurred. The facts here demonstrate more than a simple *Terry* stop, in which police may momentarily detain someone on the street for brief questioning and may conduct a brief frisk for weapons. *See*

*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Murphy did not question the plaintiffs where they stood in the parking lot, nor did he perform any investigation regarding any crime that he suspected may have occurred. He simply told the boys, "Come on, let's go," and took them into the police station. As this was not a *Terry* stop but detention for the purposes of investigation, more than mere reasonable suspicion by the police officer is necessary. *See Dunaway v. New York,* 442 U.S. 200, 216, 99 S.Ct. 2248, 2258–59, 60 L.Ed.2d 824 (1979).

■ A warrantless seizure beyond the bounds of a *Terry* stop is only constitutional if probable cause existed to justify it, regardless of whether the seizure was labeled an "arrest" by the police defendants. It is uncontested that the plaintiffs were detained in a police station, searched, photographed, fingerprinted, and eventually questioned regarding a possible crime. Whether this rises to the level of an official "arrest" under the procedures of the North Chicago police department is irrelevant. It is well-established that "detention for the purposes of custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Id.* Thus, we look to whether or not the plaintiffs have presented adequate evidence that they were seized without probable cause that a reasonable jury could find for them.

■ This inquiry must be undertaken for each defendant individually. *See Sheik-Abdi v. McClellan,* 37 F.3d 1240, 1246 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 937, 130 L.Ed.2d 882 (1995). We evaluate probable cause "not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the positions of the arresting officer—seeing what he saw, hearing what he heard." *Mahoney v. Kesery,* 976 F.2d 1054, 1057 (7th Cir.1992). Probable cause must be based on more than bare suspicion. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Probable cause exists where "the facts and circumstances within [the offi-

cers'] knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a prudent person in believing that the [suspect] had committed or was committing an offense." *Beck v. State of Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

▇▇▇▇ On the facts before us, we find that the plaintiffs have presented a question of material fact as to whether Murphy had probable cause to seize Geoffrey and Calvin.[7] Murphy has not established any reason to believe that Geoffrey and Calvin had committed a crime other than the mere fact that they were present in the parking lot. The "seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979). The plaintiffs' mere proximity to Jamal, who was suspected of criminal activity, "does not, without more, give rise to probable cause." *Id.* Here, Murphy had nothing more to support any suspicion of Geoffrey and Calvin.

It is uncontested that in Murphy's presence Peterson, the only eyewitness, identified Jamal as the only boy to have entered the car, and that at least one of the other boys protested his innocence of any wrongdoing. By contrast, Murphy's recollection that Peterson told him that "these kids" had been in the car (or words to that effect) is disputed by Peterson. In the context of a motion for summary judgment, we view the evidence in the light most favorable to the non-moving party, so Peterson's version must prevail here.

Further, Murphy performed no investigation to determine whether the plaintiffs were actually involved in any crime, although he could easily have done so. Instead, he took them into the police station and turned them over to the police officer who was the putative victim of the crime. On these facts, a reasonable jury could find that Murphy detained Geoffrey and Calvin without probable cause.

An earlier case decided by the Seventh Circuit, *Moore v. The Marketplace Restaurant,* 754 F.2d 1336 (7th Cir.1985), is helpful

to our analysis here. There, following a complaint by a restaurant owner that the plaintiffs had refused to pay, the police arrived at the plaintiffs' homes and arrested them after determining only that they had been in the restaurant that evening. The court held that the police did not have probable cause to arrest as they had performed no real investigation of the alleged crime, and there were no exigent circumstances justifying such summary action. The crime was not particularly serious, the plaintiffs were not dangerous, and they were not fleeing the scene. The arrest could have been avoided if the police had performed a proper investigation, and so summary judgment for the police was improper. *Id.* at 1345–46.

▇▇▇▇ Here, the crime suspected was likewise not serious (at most, trespass to a vehicle) and the suspected perpetrators were far from dangerous. Murphy had no reason not to conduct a preliminary investigation to determine what had happened and who was involved. Murphy performed no investigation at all, however; he merely took all three boys into custody. Probable cause is "a proper issue for the jury if there is room for a difference of opinion." *Llaguno v. Mingey,* 763 F.2d 1560, 1565 (7th Cir.1985) (*en banc*). Here, as in *Moore,* summary judgment on the issue of whether probable cause existed to seize the plaintiffs would be improper.

▇▇▇▇ The issue of whether Kaczmaryn and Van Dien had probable cause to continue to hold all three boys, searching, fingerprinting and photographing them, is more complex. It is well-established that, if there is no probable cause for the underlying decision to effect a seizure, other police officers who assist in or continue the seizure are not insulated from liability. "[O]fficers may treat information that a warrant is outstanding for a suspect's arrest as presumptively correct, but when 'the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.' An arrest without probable cause is illegal, no matter what the officers believed." *Ruehman v. Sheahan,* 34

---

7. The plaintiffs do not dispute that the police had probable cause to detain Jamal.

F.3d 525, 527 (7th Cir.1994) (quoting *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971)) (citations omitted). *See also United States v. Hensley*, 469 U.S. 221, 232, 105 S.Ct. 675, 682, 83 L.Ed.2d 604 (1985) (police may reasonably rely on information provided by other officers in detaining suspects for questioning, but if the detention is not adequately justified to begin with it is unconstitutional). As we have found that Murphy lacked probable cause to detain the plaintiffs, the continuation of that detention by Kaczmaryn and Van Dien was also improper, "no matter what the officers believed." *Ruehman*, 34 F.3d at 527.[8]

■ This is not the end of the inquiry, however; we must also address whether each of these defendants is entitled to qualified immunity on their actions. State officials may receive qualified immunity for their discretionary actions unless those actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity is available if the official could reasonably have believed that his or her actions were lawful, even if it turns out that the official was mistaken. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987).

■ The standards enunciating what qualifies as a "seizure" within the meaning of the Fourth Amendment, and what qualifies as probable cause for such a seizure, were well-known to reasonable police officers at the time of the events alleged in the complaint. *Dunaway* and its progeny had clearly established that taking a suspect to a police station in order to search, fingerprint, photograph and question him or her is a seizure for which there must be probable cause. *See Dunaway*, 442 U.S. at 216, 99 S.Ct. at 2258–59; *see also Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (transporting a person to a police station and detaining him there for fingerprinting is a seizure that requires probable cause).

Murphy did not witness any crime himself, and the only eyewitness to the crime identified only one boy as having entered the car. Yet Murphy failed to make any other inquiries to determine whether probable cause existed to suspect the other boys of involvement, although he could easily have done so. We find that Murphy is not entitled to summary judgment on the basis of qualified immunity.

■ The question of qualified immunity for Kaczmaryn and Van Dien's continued detention of the plaintiffs comes out differently. Kaczmaryn was told by Murphy that "these boys" had been in his car, which gave him probable cause to believe that all three boys may have committed a crime. A police officer is entitled to rely upon information provided to him or her by another police officer. *See O'Leary v. Luongo*, 692 F.Supp. 893, 902 (N.D.Ill.1988). Thus, neither Kaczmaryn nor Van Dien violated "clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, in continuing the detention of plaintiffs begun by Murphy, as they reasonably believed that the detention was supported by probable cause.

■ Peterson's second identification of Jamal as the one who had entered the car, made inside the police station in the presence of Kaczmaryn and possibly Van Dien, does not negate this conclusion. While the continuation of even a lawful arrest may violate the Fourth Amendment if the police subsequently discover facts negating probable cause, *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986), the events here do not warrant an inference that probable cause was dissipated. Peterson admits that he did not affirmatively tell anyone inside the station that Geoffrey and Calvin had done nothing wrong, and the mere fact that he positively identified only Jamal need not have led a reasonable police officer to conclude that the plaintiffs, who were brought in with Jamal, were not involved. Law enforcement officials who "rea-

8. Likewise, if the arrest was illegal, so was the search conducted by Kaczmaryn. *United States v. Janik*, 723 F.2d 537 (7th Cir.1983) (the arrest must be lawful in order for a search incident to arrest to be justified).

sonably but mistakenly conclude that probable cause is present" are entitled to qualified immunity. *Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3039. Thus, qualified immunity protects Kaczmaryn and Van Dien from liability for their continuation of the plaintiffs' seizure.

*The Use of Excessive Force and Failure to Intervene*

■■■ In order to prevail on a claim of excessive force, a plaintiff must show that the force used to effectuate the police action (here, a pat-down search) was unreasonable under the circumstances. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The defendants argue that (1) there is no "objective" evidence that excessive force was used, and (2) even if the force used was somewhat excessive, it was not so plainly excessive that they are prevented from claiming qualified immunity.

■■■ Serious disagreement between the parties as to the material facts of Kaczmaryn's search of the plaintiffs, in combination with an inadequately developed factual record, make summary judgment inappropriate on this issue. The parties dispute strenuously whether Kaczmaryn used excessive force in kicking the boys' feet apart. Defendants repeatedly argue that there is no "objective" evidence that Geoffrey and Calvin sustained bruising due to Kaczmaryn's force, and indeed the plaintiffs have submitted no corroboration of these injuries. However, the plaintiffs' statements in affidavits that they were in fact severely bruised and that personal property in their pockets was crushed by the force of the search is not rebutted by any objective evidence from the defendants, and must be taken as true for purposes of this motion. Factors to be considered in evaluating a claim that the force used was objectively reasonable include whether the suspects posed an immediate danger to the officers' safety, the severity of the crime, and whether the suspects were

actively attempting to resist arrest or flee. *Id.* at 396, 109 S.Ct. at 1871–72. Where, as here, there is no evidence that any of these factors existed,[9] testimony by the plaintiffs that the use of force caused bruises is sufficient to prevent summary judgment. *See, e.g., Davis v. Thillman,* 1994 WL 14620, *5 (N.D.Ill. Jan. 19, 1994); *Monroe v. Mazzarano,* 1992 WL 199829, *15–16 (N.D.Ill. Aug. 10, 1992).

■■■ For the same reasons, qualified immunity cannot be granted. At the time of Kaczmaryn's search, the right of an unresisting suspect not to be subjected to excessive force during a search was well-established. *See Cintron v. Figueroa,* 1991 WL 140146, *5 (N.D.Ill. July 22, 1991). Accordingly, qualified immunity for Kaczmaryn turns on whether a reasonable officer in the same circumstances would have known that the amount of force used was excessive—but the amount of force actually used is a material fact that is in dispute. "Where the facts giving rise to qualified immunity are disputed, summary judgment is not proper." *Monroe,* 1992 WL 199829 at *15. Thus, we cannot grant qualified immunity on the excessive force claim.

■■■ As for Van Dien's alleged failure to intervene to prevent the excessive force, the defendants failed to address this claim in their motion. In order for a police officer to be liable for failing to intervene to prevent unconstitutional harm from being inflicted, the officer must have had (1) reason to know of the constitutional violation, and (2) a realistic opportunity to intervene to prevent the harm from occurring. *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir.1994); *see also Thompson v. Boggs,* 33 F.3d 847, 857 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1692, 131 L.Ed.2d 556 (1995). The defendants have not argued either that Van Dien did not know of any constitutional violations by Kaczmaryn, or that he did not have a realistic opportunity to intervene.[10] In-

---

9. Defendants point to the fact that one boy briefly turned toward Kaczmaryn during his search as justification for unspecified "appropriate corrective measures" by Kaczmaryn. However, they make no argument that this movement, performed by an unarmed boy inside a police sta-

tion, was in fact a show of serious resistance or otherwise cause Kaczmaryn to fear for his safety.

10. The defendants did make a belated stab at presenting these legal arguments in their reply brief. However, the plaintiff had no opportunity

stead, the defendants argued only that Kaczmaryn did not use excessive force in the first place. As that issue is still in dispute, see above, we cannot find that Van Dien is entitled to summary judgment. We likewise find no facts on which to base qualified immunity for Van Dien's alleged failure to intervene.

## THE OTHER CLAIMS

*Section 1981 Claim (Count I)*

There is some doubt as to whether plaintiffs may use 42 U.S.C. § 1981 as a basis for a claim of racial discrimination in an arena other than the making and enforcement of contracts. The literal language of the section, which states that "All persons within the jurisdiction of the United States ... shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind [as white citizens], and to no other," at first blush seems to support such a cause of action. In 1984, the Seventh Circuit agreed with this interpretation in *Bell v. City of Milwaukee*, 746 F.2d 1205, 1232 (7th Cir. 1984), holding that § 1981 is implicated in governmental misuse of power that is racially discriminatory. Five years later, however, the Supreme Court stated that "Where an alleged act of discrimination does not involve the impairment of one of these specific [contract-related] rights, § 1981 provides no relief." *Patterson v. McLean Credit Union*, 491 U.S. 164, 176, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1976). Although the scope of this statement is not entirely clear, it may undermine on the vitality of *Bell's* approach to § 1981. *See Ford v. City of Rockford*, 1992 WL 309603 (N.D.Ill. Oct. 15, 1992). The Seventh Circuit has not addressed the issue since *Patterson* was handed down.

We need not resolve this issue here, as the defendants have made no argument as to the plaintiffs' § 1981 claim (Count I). Thus, we do not grant summary judgment on Count I. Should this claim be presented at trial, the plaintiffs will need to show (1) that § 1981 is a viable cause of action for non-contract-based racial discrimination; and (2) that the

to respond or produce evidence on these arguments, and so it would be unfair of us to consider

police intentionally discriminated against them on the basis of race so as to violate one of their rights as enumerated in the language of § 1981, *see East v. City of Chicago*, 719 F.Supp. 683, 687 (N.D.Ill.1989).

*Equal Protection Claim (Count III)*

■ In order to prevail on their § 1983 equal protection claim at trial, the plaintiffs must show that the police intentionally discriminated against them due to their race. *Sherwin Manor Nursing Center, Inc. v. McAuliffe*, 37 F.3d 1216, 1221 (7th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 172, 133 L.Ed.2d 113 (1995). The defendants have not directed any arguments toward Count III. Thus, we need not consider it for summary judgment.

*State Law False Imprisonment Claim*

■ The plaintiffs must make essentially the same showings for their state common law false imprisonment claim as for their Fourth Amendment improper seizure claims. *See Dutton v. Roo–Mac, Inc.*, 100 Ill.App.3d 116, 119–20, 55 Ill.Dec. 458, 461–62, 426 N.E.2d 604, 607–08 (2d Dist.1981) (false imprisonment in Illinois consists of unlawful restraint; inquiry turns on existence of probable cause for arrest). The plaintiffs' false imprisonment claim thus survives the defendants' motion for summary judgment, as we found above that there is an issue of material fact as to whether the defendants lacked probable cause to seize the plaintiffs. However, public officials may be immune from liability under the Illinois doctrine of public official immunity if their actions constitute a good faith exercise of discretionary duties. *Jones v. Village of Villa Park*, 815 F.Supp. 249, 254 (N.D.Ill.1993). Here, there is no evidence that Kaczmaryn and Van Dien's belief that they had probable cause to continue the detention was based on bad faith: they could reasonably rely on Murphy's statements that all the boys had been involved in a crime. The reasonableness of their reliance is not negated by the fact that Murphy's seizure of the boys may have been

them now.

illegal. Thus, Kaczmaryn and Van Dien are shielded from liability on Count IV under Illinois' doctrine of public official immunity. Murphy and the City remain potentially liable on Count IV.

## CONCLUSION

For the foregoing reasons, we grant summary judgment based on qualified immunity in favor of defendants Kaczmaryn and Van Dien on those claims in Counts II and IV which allege wrongful seizure of the plaintiffs. We deny the defendants' motion for summary judgment [16–1] as to: Count I; the Count II claims against Murphy for improper seizure, against Kaczmaryn for excessive force, and against Van Dien for failure to intervene; Count III; and the Count IV claims against defendants Murphy and the City of North Chicago. We also deny the motion to strike the affidavit of Elisha Mitchell [41–1] [41–2] as moot for the reasons stated in this order.

A final pretrial order that is consistent with this Order will be due on March 1, 1996. This case will be placed on this Court's Spring Trial Calendar. A status hearing will be held on February 8, 1996 at 9:00 a.m. for the express purpose of setting a firm trial date.